JAMES N. EVERETT v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Division One, July 14, 1908.

1. **NEGLIGENCE: Trespasser: Licensee.** The right of way was not inclosed and the place of injury was just at the outskirts of the town; there was no sign warning people against trespassing upon the railroad property, except one posted upon the outer wall of the station house 2,500 feet away; for many years, inhabitants of the town had habitually and daily used the track as a footpath, and this fact was known by the engineer and fireman. *Held,* that a pedestrian who stepped upon the track and stopped to look for a train before proceeding along the track and was struck by a train, cannot be declared as a

Everett v. Railroad.

matter of law to have been a trespasser, but whether or not she was a trespasser was a mixed question of law and fact, and being such was rightfully submitted to the jury.

2. ———: ———: **Wantonness.** Where the pedestrian on the track cannot be declared as a matter of law to have been a trespasser, it is wholly immaterial whether defendant's servants in charge of the train recklessly and wantonly ran the train against her.

3. ——— ——— :———: **Pleaded.** The charge of wilfulness is sustained by proof of negligence. The mere fact that the petition charged that the injury was wilfully and wantonly caused by defendant's servants will not prevent a recovery by plaintiff, if the evidence shows that the injury was the result of their negligence and carelessness.

4. ———: **Contributory: Standing on Track: Prima-Facie Case: No Headlight: No Warning.** Plaintiff's wife and two other women, who had been fishing, left their boat and proceeded along a footpath which led along and across defendant's track. When they reached the point where the path crossed the track, they heard a train coming from the east, and stepped back to the south side of the track and soon the first section of defendant's freight train passed. Immediately thereafter the three lined up along the south end of the ties, facing north, but looking east for another train which they heard approaching from that direction. While standing there a freight train with a bright electric light on the track of another railroad, which at a distance of 100 feet paralleled defendant's, came in sight around a bend a half mile to the east. This headlight attracted their attention, but did not so absorb their minds as to prevent them from looking down defendant's track to see if there were any approaching trains, yet none of them saw or heard the train which struck plaintiff's wife. The accident occurred at about 8 o'clock p. m., May 24th, at a time when it was sufficiently light for persons and objects on the unobstructed track to have been seen from two to four hundred feet. The two survivors testified that the bell was not rung or the whistle sounded as the train, which was the second section of defendant's freight train, approached, which it did so quickly and so suddenly that it passed them before they were able to realize what had occurred. It was running at a speed of thirty-five miles an hour, there was no headlight, and no bell was rung and no whistle sounded, and the track at that place had continuously been used for years as a footpath, and this fact was known to the engineer and fireman, and they had been racing their train with the one having the bright electric headlight on the parallel railroad, and had made the distance of five miles from the last station east in six minutes. *Held,* that

Everett v. Railroad.

plaintiff made out a prima-facie case, and the court cannot, even though conceding that his wife was negligent in being upon the track, declare as a matter of law that she was guilty of such contributory negligence as bars a recovery.

Appeal from Franklin Circuit Court.—*Hon. Wm. A. Davidson,* Judge.

AFFIRMED.

*L. F. Parker, W. F. Evans* and *John G. Egan* for appellant.

(1) The notice of the railroad company posted at its station at Pacific forbidding trespassing upon its track or premises prevented any license arising from trespassing thereon. Frye v. Railroad, 200 Mo. 403; Koegel v. Railroad, 181 Mo. 396; Hyde v. Railroad, 110 Mo. 396; Pulley v. Railroad, 94 Iowa 567. (2) Before the duty can be imposed upon the railroad company to exercise ordinary care to discover trespassers upon its track, it must be shown that trespassers habitually used its track, with its consent, at the hour of the day in question. Frye v. Railroad, 200 Mo. 401; Engelking v. Railroad, 187 Mo. 158. (3) There is no duty to trespassers to have a headlight upon an engine. Frye v. Railroad, 200 Mo. 407; Hyde v. Railroad, 110 Mo. 279. (4) It was not negligence *per se* if the defendant had no headlight on the engine. Barry v. Railroad, 98 Mo. 73; Hyde v. Railroad, 110 Mo. 279; Frye v. Railroad, 200 Mo. 407. (5) There is no duty toward trespassers not to run at a high rate of speed. Railroad v. Wood, 99 Va. 156. (6) The negligence of the deceased is a complete defense to any claim that the train was running at an excessive speed. Jackson v. Railroad, 157 Mo. 621; Schmidt v. Railroad, 191 Mo. 215. (7) Running at a high rate of speed is not evidence of wantonness. Peterson v. Railroad, 156 Mo. 552; Schmidt v. Railroad, 191 Mo. 235; Green v. Railroad, 192 Mo. 131;

Blanchard v. Railroad, 126 Ill. 416. (8) Section 1102, Revised Statutes 1899, on the subject of sounding of bell or whistle for public road crossings, does not apply for the benefit of a person on the track or right of way from the crossing. Bell v. Railroad, 72 Mo. 58; Evans v. Railroad, 62 Mo. 58; Maxey v. Railroad, 113 Mo. 1; Railroad v. Workman, 66 Ohio St. 509; Shackelford's Admr. v. Railroad, 84 Ky. 47; Batchelder v. Railroad, 72 N. H. 528. (9) The railroad company is not required to give signals to warn trespassers on its track before it discovers them upon the track. Sites v. Knott, 197 Mo. 716. (10) Failure to give signals is not evidence of wantonness. Matta v. Railroad, 69 Mich. 109. (11) The negligence of the deceased is a complete defense for any failure to give a signal of the approach of the train, if there was such failure. Porter v. Railroad, 199 Mo. 97; Koegel v. Railroad, 181 Mo. 397; Green v. Railroad, 192 Mo. 139; Mockowik v. Railroad, 196 Mo. 550; Lane v. Railroad, 132 Mo. 27; Mizzell v. Railroad, 132 Ala. 504. (12) The engineer has a right to presume that a person on or near the track will get off or keep off so as to avoid being struck by the train, and is not bound to make an effort to stop the train until it appears that such person will not make such effort. Carrier v. Railroad, 175 Mo. 483; Sites v. Knott, 197 Mo. 709; Tanner v. Railroad, 161 Mo. 497; Skipton v. Railroad, 82 Mo. App. 142; Schmidt v. Railroad, 191 Mo. 232; Jackson v. Railroad, 157 Mo. 632. (13) The railroad company is not liable in this case on the last chance or humanitarian doctrine. Frye v. Railroad, 200 Mo. 377; Koegel v. Railroad, 181 Mo. 379; Zumault v. Railroad, 175 Mo. 288; Tanner v. Railroad, 161 Mo. 497; Kreis v. Railroad, 148 Mo. 321; Ayers v. Railroad, 190 Mo. 228; Engelking v. Railroad, 187 Mo. 158; Riggs v. Railroad, 158 Mass. 309; Brennan v. Railroad, 55 U. S. App. 51; Railroad v. Reichert, 69 Ill. App.

91; Hoopes v. Railroad, 72 Kan. 422; Finnegan v. Railroad, 127 Mich. 15; Sims v. Railroad, 116 Mo. App. 579. (14) If a person on or near the track could have seen the train if he looked, it is conclusively presumed that he did see the train, and testimony that he looked and did not see the train is of no effect. Porter v. Railroad, 199 Mo. 98; Kelsay v. Railroad, 129 Mo. 374; Graney v. Railroad, 157 Mo. 679; Lane v. Railroad, 132 Mo. 27; Mockowik v. Railroad, 196 Mo. 569; Schmidt v. Railroad, 191 Mo. 236. (15) If the attention of the deceased was diverted to the Missouri Pacific train, that did not excuse her negligence in failing to discover the Frisco train, and in failing to place herself at a safe distance from the Frisco track. Maxey v. Railroad, 113 Mo. 11; Green v. Railroad, 192 Mo. 142; Koegel v. Railroad, 181 Mo. 389; Peterson v. Railroad, 156 Mo. 556; Butts v. Railroad, 98 Mo. 272; Guhl v. Whitcomb, 109 Wis. 69; Schmidt v. Railroad, 149 Pa. St. 357. (16) If the view of the deceased to the east along the Frisco track was obscured by smoke it was her duty to have placed herself at a safe distance from the track and stayed there until the smoke drifted away and she could have seen with certainty whether or not a train was coming upon the Frisco track, and her failure to perform such duty was negligence. Oleson v. Railroad, 143 Ind. 405; Heaney v. Railroad, 112 N. Y. 122; Railroad v. McClellan, 69 Ohio St. 142; Railroad v. Fisher, 49 Kan. 460; McCrory v. Railroad, 31 Fed. 531. (17) The contributory negligence of the deceased should bar recovery in this case. Frye v. Railroad, 200 Mo. 377; Porter v. Railroad, 199 Mo. 82; Koegel v. Railroad, 181 Mo. 379; Zumault v. Railroad, 175 Mo. 288; Kreis v. Railroad, 148 Mo. 321; Tanner v. Railroad, 161 Mo. 497; Ayers v. Railroad, 190 Mo. 228; Engelking v. Railroad, 187 Mo. 158.

*Jesse H. Schaper* and *W. L. Cole* for respondent.

(1)   There was substantial evidence to warrant the court in submitting the case to the jury, and the verdict is amply supported by the evidence. It was the peculiar province of the jury to determine whether or not the place where the deceased was injured was of such a character that appellant had reason to anticipate the presence of persons on the track, and whether or not the time when she was injured was such that it had reason to anticipate the presence of persons on the track, and from all of which arose the duty on the part of appellant to be on the lookout for persons, and to see and warn them. Eppstein v. Railroad, 197 Mo. 720; Rayburn v. Railroad, 187 Mo. 573; Fearons v. Railroad, 180 Mo. 222; Morgan v. Railroad, 159 Mo. 262; Chamberlain v. Railroad, 133 Mo. 587; Ahnefeld v. Railroad, 212 Mo. 280. Contributory negligence will not exonerate defendant and disentitle the plaintiff from recovering, if it be shown that defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the negligence of the deceased wife of plaintiff. Inland Seaboard Coasting Co. v. Tolson, 139 U. S. 557; Gleeson v. Railroad, 140 U. S. 443; Railroad v. Ives, 144 U. S. 408; Railroad v. Cox, 145 U. S. 593; Guild v. Pringle, 76 C. C. A. Rep. 192. The trial court in passing upon the demurrer to the evidence was bound to take notice of the whole case, and if, upon any view which could be properly taken of the facts, the evidence tended to establish the plaintiff was entitled to recover, the case should have been submitted to the jury. Railroad v. Cox, 145 U. S. 606; Dunlap v. Railroad, 130 U. S. 649; Guild v. Pringle, supra; Railroad v. Genry, 163 U. S. 353. The demurrer admits as absolutely true all the evidence offered favorable to plaintiff and all reasonable and fair inferences to be drawn therefrom in his favor. Bender v. Railroad, 137 Mo. 240; Pauck v. St. Louis

Beef & Provision Co., 159 Mo. 475. (2) Appellant's servants, engineer and fireman, in charge of the locomotive and train, well knew that the Missouri Pacific train was running west and parallel with and a short distance in advance of their own, and had they looked, they could have seen that the attention of the deceased and her company was drawn to said passing Missouri Pacific train and unaware of the near approach of appellant's train coming from the same direction, a short distance in the rear, and that some warning or signal was necessary to put her on her guard in her perilous situation. The failure on the part of appellant's said servants to sound the whistle, ring the bell or give her any warning whatever, was culpable negligence. If said servants had been on the lookout, even after they had approached too close to be stopped, and had they sounded the whistle one or more times, the ladies would no doubt have stepped back and the life of Mrs. Everett would have been saved. Chamberlain v. Railroad, 133 Mo. 587; Morgan v. Railroad, 159 Mo. 262; Fearons v. Railroad, 180 Mo. 222; Eppstein v. Railroad, 197 Mo. 720.

WOODSON, J.—This suit originated in the circuit court of Franklin county, wherein plaintiff seeks to recover the sum of $5,000 damages from the defendant for the killing of his wife, Annie Everett, at Pacific, Missouri, by the alleged negligence of its servants and employees in the operation of one of its freight trains.

The petition in substance charged:

First. That the railroad track of defendant, for a distance of a half mile east of the corporate limits of Pacific, on May 24, 1904, and for a long time prior thereto, had been accustomed to be used as a road and footpath to and from Pacific by pedestrians from that city and vicinity, and generally by the forbearance, knowledge and tacit consent of defendant, and at the

point thereon where the alleged injury occurred, said track of defendant was level and straight east and west therefrom for a long distance.

Second. That plaintiff's wife, Annie Everett, on May 24, 1904, at eight o'clock p. m., was walking upon the said railroad track of defendant about three hundred feet east of the corporate limits of Pacific, and while so walking thereon, a certain west-bound freight train in charge of and operated by defendant on said track ran against and instantly killed plaintiff's said wife, and that her death was the direct result of the wanton disregard and of the careless and reckless manner in which the defendant's said train was run in this:

"That the defendant, its agents, servants and employees, in charge of and operating said train, carelessly and negligently omitted to have placed in front of the engine drawing said train a headlight, lighted up at the time and place the injury herein complained of occurred, and carelessly and negligently ran said train at an excessive rate of speed at the time and place the injury herein complained of occurred.

"That after the defendant, its agents, servants and employees, in charge of and operating said train, seeing, or by the exercise of reasonable care and diligence, had they not been reckless in operating said train, could have seen the dangerous position in which plaintiff's said deceased wife, Annie Everett, was situated, and seeing, or by the exercise of reasonable care and diligence, if said train had not been recklessly operated by defendants, its agents, servants and employees in charge thereof, could have seen, the imminent peril in which plaintiff's said wife was placed, and that said deceased was unaware of the near and dangerous approach of said train, and that the defendant, its agents, servants and employees negligently failed to sound the usual and ordinary signal in

time to avert the injury herein complained of, and in fact did not at any time before the said injury to said Annie Everett either ring the bell, sound the whistle, or give any other signal by which his said wife might be warned of the near and dangerous approach of said train, and negligently failed and neglected to use the brakes or other appliances provided for stopping said train and at hand, and negligently failed to use the appliances provided and at hand for putting said train under control and stopping same before it struck and killed plaintiff's wife, but on the contrary, thereof, recklessly, negligently, willfully and wantonly ran its said train against the plaintiff's said wife, so mutilating, wounding and bruising her that from the effects thereof she did then and there immediately die, to the damage of the plaintiff in the sum of five thousand dollars, for which sum of five thousand dollars the plaintiff prays judgment against the defendant and for the costs of this suit.''

Defendant's answer contains:

1. A general denial, except the admission of defendant's corporate existence and the death of plaintiff's wife, Annie Everett, from injuries received on May 24, 1904.

2. A plea of contributory negligence of plaintiff's said wife, and that she was a trespasser.

Plaintiff's reply was a general denial of the new matter set up in the answer.

The case was tried before said court with the intervention of a jury, and was left to the jury upon evidence given by both parties, and under the instructions of the court the jury returned a verdict finding the issues for plaintiff and assessing his damages at five thousand dollars, for which sum, in pursuance of the verdict, the court entered judgment for plaintiff. After unavailing motions for a new trial

and in arrest of judgment, defendant appealed to this court.

Plaintiff's evidence tended to prove the following facts:

That at the time of the injury and death of Annie Everett she was the wife of the plaintiff. That Pacific, the place where the injury occurred, is a town of about 1200 inhabitants, through which pass two railroads—one being the Missouri Pacific and the other is the road of defendant. Those two roads run parallel with each other from east to west and about one hundred feet apart. Each has a depot at Pacific, and are opposite to each other. The depot and track of the latter are south of the former. The track and right of way of defendant was straight and level for a distance of one-half mile east of its depot, with no intervening obstruction of any kind. At a point about a half mile east of the depot the track curves somewhat to the south, though the view is still clear. At the time of the accident defendant was constructing a pump house on its right of way at a point one quarter of a mile east of its depot. Annie Everett was killed at or near that pump house. At that place defendant's track and the Meramec river run almost parallel with each other, the river being about one hundred feet south of the track and about two hundred feet east of the pump house. On the river there is a landing place for small boats, where they are tied up and have been used generally for years by the people of Pacific for fishing and pleasure purposes. At a point about two hundred feet still further east of the pump house there is located what is called the "tie chutes," which have been used for years for taking railroad ties from the river with a view of loading them upon the cars.

Just north of the pump house and north of the Missouri Pacific tracks there are located some sand works, which have been operated for years in taking

sand rock out of the river bluff, crushing and loading them on the cars; and about five hundred feet east of those works are located other works of like nature, which have also been in operation for many years. Some two hundred feet east of the pump house a public road crosses the tracks of the defendant and those of the Missouri Pacific Company. This road then runs along the foot of the bluff and diverges from the railroad tracks in a northwesterly direction and enters the town of Pacific, a distance of about two city blocks north of the Missouri Pacific track.

The tracks of defendant are not inclosed from its depot in Pacific to the point where the said public road crosses its track, a distance of about fifteen hundred feet, except on the south side thereof from the depot to the pump house an adjoining landowner has constructed a fence to inclose his land.

On the outside wall of the depot building, at Pacific, there was painted a notice warning the public to keep off its right of way, tracks, etc., but no such notice was posted between the depot and the point where the tracks cross the public highway before mentioned.

That for years at least ten men have been constantly engaged in the operation of the "tie chutes," and a like number in operating the sand works north of the Missouri Pacific track opposite the pump house, and as many more were engaged at the sand works which were located still further east. All of these men resided in Pacific and usually walked along the tracks of the defendant or those of the Missouri Pacific Company in passing to and from their work. And ever since the road of defendant was constructed, twenty years, many people walked on its track in passing between Pacific and the boat landing on the Meramec river, which was the best and most convenient way for them to go. So great was this continued use of

defendant's track, that a well-defined footpath was established by said workmen and city people in walk-. ing along and upon it in passing back and forth be- tween the city and said different points during those many years. That this path was well defined and ran from the boat-landing on the river to the south side of defendant's track, thence along the south side of the track for a distance of about two hundred feet to the defendant's pump house, and thence north across its tracks to the north side thereof, and thence west along the north side of the track of the Missouri Pacific.

On the afternoon of May 24, 1904, plaintiff and his wife and his niece, Vida Canari, together with the Rev. Mr. Wright and his wife, Zoezilla Wright, all residents of Pacific, formed a fishing party and walked on the track of defendant and in part along the foot- path described from Pacific to the boat-landing, where they entered a small boat and spent the afternoon fish- ing and rowing in the river.

About 8 o'clock p. m. they returned to the boat- landing, and while plaintiff and Rev. Wright were tying up the boat, the ladies started on for Pacific, walking along the footpath before mentioned, that is to say, up the river bank to the south side of defend- ant's track, thence along the south side thereof two hundred feet to the pump house, and then stepped upon and started up the track towards Pacific, but having just then heard a long whistle from the east they walked back from the track some little distance at or near the pump house, and waited until a train passed over defendant's track, and they stood there looking down the Missouri Pacific and defendant's track to- wards the east, and heard the rumbling of some train, when the Missouri Pacific bright electric headlight came around the curve, and then Mrs. Everett made

some remark, which is not preserved in the record, and she and the ladies with her saw it was a Missouri Pacific train coming—they walked up to the south side of defendant's track and there stopped. Mrs. Everett stood about a foot behind and to the left of Mrs. Wright, and Miss Canari stood still a little farther east. There they stood abreast for a few moments, in the gravel at the south end of the cross ties of the track, facing north, and looked a second time down the Missouri Pacific and Frisco tracks east to make sure there was no train coming from the east on defendant's track before they stepped upon it, and none of them either saw or heard a train, and being unconscious of the approach of any train on the track of defendant from the east, that very moment the second section of defendant's freight train, which was some fifty minutes late, came along from the east at the rate of thirty-five miles an hour, and the flagstaff of the engine struck plaintiff's wife on the head and killed her almost instantly.

Mrs. Wright and Miss Canari were the only eyewitnesses to this unfortunate occurrence. The plaintiff and Rev. Wright had not then left the boat at the landing and did not know anything about the accident.

The trainmen in charge of the train did not see deceased nor either of the two ladies who were with her at the time she was killed, did not know of the injury till their train reached St. Clair, a station eighteen miles west of Pacific, when and where a telegram informed them of the injury.

That the train referred to on the Missouri Pacific track and defendant's train which struck plaintiff's wife were at that time running a race from Allenton, the next station east, to Pacific, a distance of five miles, and that the run was made in six minutes.

The engineer and firemen who were in charge of

the Missouri Pacific train testified that they were racing with and watching defendant's train, from Allenton to Pacific; and Mrs. Wright and Miss Canari and John Roby, all witnesses for plaintiff, testified that there was no headlight on defendant's engine and that they did not hear the ringing of the bell, or the sounding of the whistle, nor see or hear any signal or warning of the approach of the train prior to the time the injury happened.

The evidence also tended to show that at the time of the injury it was twilight and that persons could be seen and distinguish objects at a distance of from two to four hundred feet.

The engineer in charge of the defendant's train, a witness for defendant, on cross-examination testified, among other things:

"Q. Then, Mr. Ramie, you have known and been acquainted with defendant's road at Pacific for about fourteen years? A. Yes, sir.

"Q. You are familiar with the surroundings there, the pump house, the tie chutes, sand works, etc.? A. Yes, sir.

"Q. You know that people do work there? A. Yes, sir.

"Q. Have you seen people upon your track? A. Yes, sir.

"Q. Walking to Pacific and to the sand works? A. Yes, sir.

"Q. And the tie chutes? A. Yes, sir.

"Q. And to the Meramec river there? A. Yes, sir. I cannot say I know where they was going but I have seen people on the track there.

"Q. And you knew that on the 24th day of May, 1904, as you came along? A. Yes, sir.

"Q. What look, if any, do you take along there? A. I look out everywhere on the road, that is my rule.

"Q.  What difference, if any, do you make in this particular instance?   A.   It did not make any difference."

The defendant introduced substantially the following evidence:

George E. Fryman: I reside at Springfield—occupation, civil engineer. I know where the Missouri Pacific railway and the St. Louis and San Francisco railroad run at Pacific, Franklin county, Missouri. This plat shows the location of those lines east of Pacific. The location of the Frisco pump house is shown upon the plat; also the location of the Missouri Pacific pump house; also the location of the joint depot at Pacific of the two railroad companies. It is 2,480 feet from the east line of that depot to the Frisco pump house. The arch culvert under the Frisco track at the point marked B. is 190 feet from the Frisco pump house. The red line south of the Frisco track is the south right of way line of the St. Louis and San Francisco Railroad Company. Immediately north of the Frisco pump house and the distance from the middle of the Frisco track north to the main track of the Missouri Pacific is seventy-six feet. For 500 feet east of the Frisco pump house the average distance between the tracks of those companies is seventy-five feet. The point of crossing of the wagon road over the railroads is shown in yellow, east of the Frisco pump house. The public highway is 165 feet north of the center line of the Frisco railroad. The brown line south of the Frisco track shows the top of the river bank. From the top of that bank north to the center of the Frisco track at the culvert is sixty-eight feet. These measurements were made October 28, 1904. The lines of the plat are absolutely correct for a period of a year and a half prior to the trial except that the Frisco pump house has been built since the accident. East of the Frisco pump house the track is on quite a curve to

the south.   Do not know how long the wagon road has been there.

A. T. Brown:   I am railroad agent for the St. Louis and San Francisco Railroad Company at Pacific, and have been for two years and five months.   When I went to Pacific the wagon road from the public crossing east of the Frisco pump house to the town of Pacific was in existence, but was 200 feet north of where it is located now.   That is, north of the location shown on the plat.   But the location of the public crossing has been the same since I have been at Pacific.   At the time of the accident to Mrs. Everett and prior to that, for over two years, that is, since a month and a half after I came to Pacific, a sign has been kept on the outside wall of the waiting room of the Frisco depot at Pacific right in front of where the public congregate.   This sign was as follows:

"Frisco System—St. Louis and San Francisco R. R. Co.   Warning to the public.

"All persons not having business with the company are hereby positively forbidden to enter, sit, stand or walk upon the railroad, side-tracks, turntables, roadways, depot or platforms, or to go upon or ride upon any of the locomotives or cars of the St. Louis & San Francisco R. R. Co., whether same be in motion or not; and all persons are especially prohibited from walking on or crossing the tracks of this company except at the legally established crossings; and notice is hereby given that this company does not consent to such use of its tracks, and no agent or officer of this company is authorized to countenance or otherwise consent to such use of such tracks, or any other purpose or use of which is hereby prohibited; and all persons are hereby notified that they use same at their peril and exclusively at their risk of injury, as they are trespassers and the company does not undertake any care for their safety.   The attention of parents

whose children go about such places or upon any of the property of this company to play or ride on trains, or for any other purpose is especially called to this notice, and they are hereby requested to keep their children away therefrom.

"D. L. WINCHELL, V. P. and Gen. Man."

I was in charge of the depot the evening of the accident and kept a record showing the number of trains arrived and left that day. I have the record. The Frisco train in question was the second section of train No. 35, freight train, going west. There were forty-three cars in the train. It arrived at the station at 8:22 p. m.

Henry Ramie: I am a locomotive engineer for the St. Louis and San Francisco Railroad Company. I was raised at Pacific and lived there until the age of twenty-three. Since then I have been working for the railroad company sixteen years. I was running the Frisco freight train in question on May 24, 1904. I was on the second section of No. 35, from St. Louis to Newburg. I had been on that run about one year. That train had been on schedule ever since I had been working there, a good long time. I was about forty minutes late that evening. My fireman was Lee Ryan. I came into Pacific with a very long train, forty-three cars, and shut off steam east of the sand cut below Pacific, and had to use steam to pull the train up to the water tank. I came into town under full control, as I expected the first section to be standing at the water tank taking water. My train was running about six or seven miles an hour when I passed the location of the Frisco pump house. It was running about the same rate when I passed the county road crossing, east of the Frisco pump house. I did not use any steam, the train was coming in slow. I did not have a race with the Missouri Pacific train. We had a head-light and it was burning all the time. We lighted it

before we left Chouteau Ave., at St. Louis yards. It was a coal oil lamp. I never noticed the Missouri Pacific train until I got through the sand cut shortly before I struck the whistling post. I whistled for town and noticed a flash come alongside on the north side and I glanced back and saw it was the Missouri Pacific train. I saw them when they passed me between the whistling post and the Missouri Pacific pump house. I just glanced at them; I had my head out of the window looking up the track. I was watching the track when I passed the pump house, paying attention to my duties, but could not help seeing the train as it passed. It did not take me from my work. I was watching, as was my duty. After the Missouri Pacific train got by me the smoke of their engine partly, but not entirely, obstructed the view in front of me. I was on the right side of my engine. East of the Frisco pump house there is a curve in the track, curving south. The effect of that curve when looking south of my track or ahead was against me, going west, because I was in the cab and could not see the opposite side of the track. The length of my engine was in front of me. I could not see anyone standing at that place there [where Mrs. Everett was struck]. I doubt if I could have seen a person in that position in the daytime. I whistled for the town and also for the country road crossing. I sounded two long and two short whistles for the road crossing near the whistling post. I gave one long blast of the whistle for the station east of that. It could have been heard distinctly at least from there to town. Nothing to prevent it. The bell on my engine was ringing east of that crossing. Could not say how long it continued to ring. I started ringing the bell after I sounded the whistle; up to the crossing anyway. I did not see or hear anybody east [west] of that crossing. I did not see Mrs. Everett or anyone there along there anywhere. I could not.

From the time I whistled for the crossing and for the town I was watching out ahead, standing up in the cab with my head out of the window and never turned my head either way.

## Cross-examination.

I did not know of Mrs. Everett being struck by my train until after I arrived at St. Clair, where I received a message to notify me to make an examination of my engine to see if there was any sign of anybody being struck. I saw that the headlight was lighted at Chouteau avenue. I did not do it myself. When I stopped at Pacific I walked around the engine and saw it was burning there. I noticed it was burning before that. I saw reflection on both sides as we came through the sand cut. On account of being notified of this accident I made a memorandum of everything that occurred. The Missouri Pacific engine was ahead of me at the sand cut. It could not have been the reflection from the Missouri Pacific engine in the sand cut. It could not have come through and down. I saw my headlight burning after I stopped at the water tank and know if it had gone out it could not have lighted itself again. It was not dark long and it was daylight when it was lighted. When I passed Pacific it was not quite dark; not very dark. I reached Pacific at 8:22. I do not remember the time it took me to run from Allenton to Pacific. I guess about fifteen minutes. The Missouri Pacific train did not start out of Allenton the same time as my train. The first I noticed their train that evening was when I was coming through the sand cut. They passed me before I got to the pump house. I must have been ahead of them out of Allenton. My run from Allenton to Pacific with forty-two or forty-three cars could not have been made in five or six minutes, to save your life. Passenger trains can hardly make it in that time. I was on the

north side of my engine going into Pacific. I could not have seen all the way to Pacific from the south side of my engine. I could not have seen all the way from the sand cut to the pump house on account of the trees.

I did not notice the Missouri Pacific train running side by side with me for four or five miles. I have been acquainted with defendant's railroad at Pacific for about fourteen years. Have seen people upon our track walking to Pacific and to the sand works and tie chutes and Meramec river. When we passed through the sand cut and on to the pump house my fireman was on the left side of the engine ringing the bell. I could not say what the fireman was doing all that time. The headlight we had was a coal oil light. That was our usual kind. We have the same to-day. Our headlight was not out when we passed the sand cut on to Pacific. It was burning. There were electric lights at Pacific. Do not remember whether they were burning when I got there. I did not give a whistle between the crossing and Missouri Pacific pump house. I started to ring the bell when I sounded the whistle, but do not know when it ceased ringing. I gave one long blast of the whistle for the town and two long and two short blasts for the crossing. I gave them at the post that is put there for the purpose, something like two hundred feet from the crossing. As I approached the location of the Frisco pump house I was looking, I never took my head inside the cab from Allenton until I stopped at the tank at Pacific. I stopped at the east tank. Do not remember how long I remained at the station; took water, got orders and went on. I did not learn there that Mrs. Everett was killed. I did not know that defendant's track was a passway used by the people going between Pacific and the river. I had seen people there the same as I do everywhere, not every day, but frequently.

### Redirect Examination.

People walk along the track at other points at all points on the road; did not notice any difference in the people walking along the track between the pump house and the depot at Pacific from what I saw at other points. At St. Clair when I received the telegram notifying me of the accident I examined my engine to see if I could find any signs. I found nothing, with the exception that the flagstaff was gone and the little bolt that holds the flagstaff up. The flagstaff was on the left side of the engine, that refers to the south rail of the track.

### Recross Examination.

The flagstaff was not ahead. It was on the end sill. The headlight was burning at St. Clair.

Lee Ryan: I am a fireman for the St. Louis and San Francisco Railroad Company and have been for about two years and two months. I was working as fireman for Mr. Ramie at the time of the accident referred to, May 24th. When we came into the sand cut east of Pacific, or before we started in, we shut off steam and I got on my side, the left-hand side, the south side of the engine. At the whistling board we whistled for town and a little farther we whistled four blasts for the crossing. He pulled the bell and tolled it. I was there continuously from the time we whistled for town and the crossing until I got ready to get back on the engine. Up to the time that we whistled I was sitting on the left side of the engine looking ahead, looking for trains. Do not think we went over seven miles an hour through the sand cut; do not think it was that fast. When we passed the Frisco pump house our train was going about the same speed, or possibly a little slowed. I did not see Mrs. Everett or the parties she was with. Our headlight was burning. It was not dark long enough to notice it until we got

into the cut. It was burning all the time until we got to the water tank, at the sand cut, and when we got to Pacific, and had been ever since we left where I lighted it. .I did not see the Missouri Pacific train until I got to the water tank. I only heard it as we passed by. After their train passed us the smoke from the Missouri Pacific engine drifted over us and darkened it some in front of us and obstructed the view. It came in front of the headlight.

### Cross-examination.

I have no recollection of how long it took to make the run from Allenton to Pacific. The Missouri Pacific train was a freight train. I was on the left-hand side of our engine from the time it passed the sand cut to the Frisco pump house. I was not looking from the rear end of our engine to the Missouri Pacific train. I had nothing to do with the whistle. I rang the bell before we reached the crossing east of the pump house. I rang it till we got to the crossing, and I started over the tank to get ready for water. I still rang the bell after we passed the crossing. I rang the bell at the pump house and afterward. I started to say that it was between the place where the Frisco pump house is now and where we took water at the east water tank that I stopped ringing and went back over the tank to take water. It was about 150 feet from the depot where we took water; about three car-lengths. The whistle was not sounded after we passed the crossing. I know positively that Mr. Ramie sounded the whistle. He gave one long blast for the town and two long and two short blasts for the crossing. He gave blasts for the crossing about 200 feet east of the crossing. I lighted the headlight myself that evening. The first place I noticed it was when we got to the sand cut. I could see reflections in there. Before we got there it was not dark enough to

see it.  We never stopped between Chouteau avenue and Pacific.  We reached Pacific at 8:15, as near as I remember.  We had an ordinary coal oil headlight. The smoke from the Missouri Pacific engine was in my face all the way from this side of the sand cut, after they passed our engine until they got near the tank.  I did not see Mrs. Everett or anybody at the pump house at the end of the track.  I was looking ahead all the time, taking a general view along the track.  The headlight was burning when we got into Pacific.  At the crossing and the pump house we were going a little slower than through the sand cut.  We shut off steam at the sand cut.  I think it was done down below Valley Park hill.  He worked the steam down at the Park and shut it off about Valley Park hill.  I did not know that anything had happened until we got to St. Clair, which is seventeen or eighteen miles from Pacific.  I had seen people go on that track between Pacific and the sand cut.  Have seen people walking all along between there and Allenton. I did not notice people walking along the tracks between the sand works and Pacific any more than between Allenton and the sand works, or anywhere else on the road.

### Redirect Examination.

I see people walking along railroad tracks every day at any place on the road, at all points.

James T. Kennedy:  I live at Pacific and have lived there twenty-nine years.  I am an engine watchman for the St. Louis and San Francisco Railroad Company at that place; have been so employed for nearly two years.  I was there on May 24th of this year, 1904.  I saw the Frisco engine on the second section of No. 35 stop for water that evening at the water tank east of the depot at Pacific.  I observed the train before it got there.  I noticed the headlight was burning as it was coming into town.  I observed

that before it stopped. With an unobstructed view I could have seen that engine on the track two hundred feet if it had not been light. I was about four hundred feet from the engine when I saw the headlight upon it.

### Cross-examination.

When I first saw this train that evening I was at the crossing west of the depot. The train was still moving. I noticed the headlight, saw it moving. I was standing directly in front of the train about four hundred feet away.

A. M. Brown: I reside at Pacific and know where the Frisco pump house is, the new one. I know the public road crossing east of that. There is a culvert near the pump house. I have lived at Pacific three years. My house faces the railroad, and I have a plain view of the pump house and crossing and of the track that runs by the pump house, and of both tracks almost to the sand cut, which is east of the public road crossing. My home is about a quarter of a mile from the pump house. I was at home on May 24th last. I saw both trains coming in that evening. Both engines were coming towards me. In my first observation they were about even, but the Missouri Pacific engine was a little ahead. I saw the headlight on both engines. They were both burning. When I saw it I thought one had an electric lamp and that the Frisco engine had an old-fashioned oil lamp. I thought the Missouri Pacific train was a passenger, because of the bright light. I saw both lights.

### Cross-examination.

I am a mail clerk on the St. Louis and San Francisco Railroad, employed by the United States government. I have been running on Frisco trains for the

past four or five years. I am under no obligation to the defendant company. My residence is about a quarter of a mile from this pump house and three blocks north of the depot. I think a block there is three hundred feet. That would be nine hundred feet north of the depot in addition to the railroad tracks and streets. I did not hear the bell ring upon the Frisco engine; do not remember hearing the bell of the Missouri Pacific engine. I could see the coal oil lamp, lighted. Looking from my residence I could see the train. The Frisco train stopped to take water at the east tank. I did not see this from the house, however. The tank is straight down from my house and there are four or five houses between. That evening I was on the porch smoking and I walked down town and I found that the Frisco train was in there going on the siding. I was on the depot platform after the train got in. I left home when I saw the train coming round the curve. I saw the train coming from my house. I saw the Frisco train after I went down to the depot standing east of the tank heading on the siding. It pulled through the siding and I started home.

G. E. Fryman (recalled): The red line south of the depot and the Frisco railroad and running east as far as shown on the plat shows the line of defendant's right of way.

This was all the evidence in the case; and at the close thereof defendant asked an instruction in the nature of a demurrer thereto, which was by the court refused, and to the action of the court in refusing same defendant duly excepted.

Thereupon the plaintiff prayed the court to give to the jury the following instructions, numbered 1, 2, 3, 4 and 5:

"1. The court instructs the jury that under the law, if they find for the plaintiff, their verdict must

be for five thousand dollars, and cannot be for more nor less than that sum if for plaintiff.

"2.  The court instructs the jury that if they shall believe from the evidence that Annie Everett, at the time she was killed was the wife of plaintiff, and that this suit was brought within six months after her death, and shall further find from the evidence that at the time and place when and where the catastrophe occurred the defendant omitted to have placed in front of the engine drawing said train a headlight lighted up and burning, and that the place on defendant's track where deceased was struck by the defendant's train was about two hundred feet west of a public road crossing over said track, and that the track, at the time, was in such condition and position for a distance from about seven to thirteen hundred feet east of the point of the catastrophe that a person standing thereon or along the side of the outer edge thereof could have been seen by the persons in charge of said train had they been in their proper posts and on the lookout ahead of them, and that said track at the place where said Annie Everett was struck and killed was frequently used by pedestrians in going to and from the city of Pacific, and the sand cut, tie chute and Meramec river, and points between said places; that said Annie Everett, while standing upon defendant's track or along the side of the outer edge thereof, became in imminent peril of being struck by defendant's train, and defendant's employees in charge of said train, by the exercise of ordinary care, could have become aware of her peril and used the means at their command in time to have averted said injury to said deceased, and they failed to exercise such care and use the means at their command so as aforesaid, and that by reason of such failure to exercise such ordinary care, said Annie Everett was struck and killed, then the jury must find for the plaintiff, though the jury may find

the deceased, Annie Everett, was guilty of negligence in standing upon defendant's track or along the side of the outer side thereof. And by ordinary care is meant such care as an ordinarily careful and prudent person would exercise under the same or similar circumstances.

"3.. If the jury believe from the evidence that at the point on the track of the defendant where plaintiff's said wife was killed, if they believe she was then and there killed by defendant's train, said track was clear and unobstructed and sufficiently straight to permit a plain view along the track from any approaching train; and if the jury believe further that at said point where said deceased was struck by the train, the roadbed of the defendant, both east and west of said spot, was at that time used, and had for a long period of time prior thereto been used, with the knowledge of the defendant, its servants and employees, by pedestrians as a passway leading to and from the city of Pacific, then it was the duty of the employees of the defendant in charge of the train, when approaching such portion of the roadbed of the defendant as was used as aforesaid as a passway, to keep a lookout for persons and to ascertain that the track was clear.

"4.   And if the jury further believe from the evidence that the engineer or fireman in charge of the train which struck the deceased, if you believe from the evidence its said train struck the deceased then and there, might have seen her by the exercise of ordinary care on their part; and if the jury further believe from the evidence that the deceased was unaware of her peril and was standing upon the defendant's track or along the side of the outer edge thereof, unconscious of the approach of the train of the defendant, then it was the duty of such engineer or fireman to give her such warning by such a signal as was within his power, as could be likely heard and would

be likely heard by any person possessing in an ordinary degree the sense of hearing in the position the deceased occupied. And if such signal was given and unheeded, then it was the duty of such engineer or fireman to use the means at his hand to have saved Annie Everett when by the exercise of ordinary care he would have discovered her peril in time to have done so; and unless at the time of the injury the engineer and fireman in charge of said train used the means at their command to provide for the safety of the deceased when by the exercise of ordinary care they or either of them would have discovered her peril in time to have saved her from injury; then the jury may find a verdict for the plaintiff in this case, although they may believe that the plaintiff's said wife was guilty of negligence in being upon the track of the defendant or along the side of the outer edge thereof and in permitting herself to be inattentive to the dangers surrounding her.

"5. The court instructs the jury that three-fourths of your number may return a verdict in this case—if less than the whole of your number return a verdict those of the jury who concur in the verdict must sign the same; if all of your number agree to the verdict, it may be signed by the foreman alone."

The court gave said instructions numbered 1, 2, 3, 4 and 5, so requested by the plaintiff; to the giving of each of them the defendant then and there duly excepted at the time.

I. The first insistence of the appellant is that the trial court erred in refusing to give its instruction in the nature of a demurrer to the evidence; and assigns three reasons therefor, namely:

First. Because the evidence shows that the deceased was a trespasser upon appellant's right of way at the time she was injured, and that it owed her no

214 Sup.—6

duty except not to wilfully and wantonly injure her.

Second. That the record contains no evidence which tends to prove appellant wilfully and wantonly injured the deceased.

Third. That the evidence shows that deceased was guilty of negligence which directly contributed to her injury, which should prevent a recovery in this case.

We will discuss those three propositions in the order stated.

*First.* Under the evidence as disclosed by the record, can the court declare as a matter of law that at the time of the injury respondent's wife was a trespasser upon the right of way of the appellant?

It is the contention of appellant that the undisputed evidence, as disclosed by the record, is that the deceased at the time she was injured was standing upon its right of way and within a few feet of the south rail of its railroad track, and that she was in no manner connected with or employed by the company; and that the record contains no evidence which tends to prove that she was rightfully there under a license or permission granted to her. If the record sustained appellant in that contention, then, according to the provisions of section 1105, Revised Statutes 1899, and the repeated adjudications of this court, there could be no escape therefrom. The authorities principally relied upon by counsel for appellant as sustaining their position are the following: Frye v. Railroad, 200 Mo. 1. c. 403; Koegel v. Railroad, 181 Mo. 1. c. 396; Hyde v. Railroad, 110 Mo. 272, 1. c. 279.

In the Frye case the accident occurred in the country, between crossings, and where the track was fenced on both sides, together with winged fences and cattle-guards, with notices posted up in several different places warning the people not to trespass upon the right of way. Under those facts this court held that the defendant had the right to expect a

clear track; that the plaintiff, who was walking along the track, was, under this statute, a trespasser, and, being a trespasser, he had no right to complain of the absence of a headlight. The other cases cited express the same views.

But counsel for respondent do not question the soundness of the law as enunciated in those cases, but earnestly maintain that they are not applicable to the facts of this case.

In the case at bar the undisputed evidence shows that the place of the injury was just at the outer skirts of a city of 1,200 inhabitants; that the railroad right of way was not inclosed; that there was no sign warning the people against trespassing upon the railroad property, except the one painted upon the exterior of the wall of the passenger station at Pacific, which was about 2,500 feet west of the place where the accident occurred; that the people of Pacific for many years had habitually used the right of way and track of appellant in going to and returning from the sand works, tie chutes and boat landing, mentioned in the evidence; and that there was a well-defined footpath along and across the track where they walked upon these occasions, averaging from twenty to twenty-five daily, independent of those who used it in going to and from the boat landing, who were quite numerous. The evidence also shows that the engineer and fireman who were in charge of the engine upon this unfortunate occasion had knowledge of the fact that the track was so used by pedestrians, and both of them testified that they were on the lookout for persons, and rang the bell and sounded the whistle to give warning to whosoever might happen to be upon or near the track at that time.

In discussing a strikingly similar case, in a very able and exhaustive opinion, written by LAMM, J., this court held that where a railroad track was used by

the public for a footpath the question of license or implied invitation to so use the track was a question of fact for the jury, and that it was the province of the jury to determine whether or not those operating a train thereon, under the circumstances, had reason to anticipate the presence of people there. [Eppstein v. Railroad, 197 Mo. 720.]    The same rule is announced in the following cases:  Reyburn v. Railroad, 187 Mo. 573; Fearons v. Railroad, 180 Mo. 222; Morgan v. Railroad, 159 Mo. 262; Chamberlain v. Railroad, 133 Mo. 587.

In the Morgan case it was held that it did not follow because the statute declares one walking upon a fenced railroad track to be a trespasser that every such person was a trespasser; that usage and custom could not repeal a statute, but might change the condition of the thing on which the statute operates; and that if the railroad company for many years acquiesced in its track being used as a footpath by the community and permitted steps over its fence to stand as a permanent invitation to them to walk on its track, it could not take refuge behind such statute in a suit to recover damages for personal injuries received by the plaintiff through the negligence of the servants in charge of the train while he was walking along the track of the company.

According to the law as announced in this class of cases, we are unable to declare as a matter of law that respondent's wife at the time she was injured was a trespasser upon the right of way of the appellant, but are of the opinion that it was a mixed question of law and fact which was rightfully submitted to the jury under the instructions of the court.

*Second.*  The second reason assigned by appellant in support of its contention that the court erred in refusing to give its demurrer to the evidence, is that the record totally fails to show any evidence which

tends to prove that their agents and servants in charge of the train wantonly or wilfully ran the engine against the deceased and thereby injured and killed her. Under the view we have taken of this case in paragraph one of this opinion, it is wholly immaterial whether they recklessly and wantonly ran the engine against her or not. That doctrine only applies to cases where the injured party was a trespasser upon the track at the time of the injury, and at a place where the agents and servants in charge of the train had no notice or reason to apprehend that any person would be present at the place where the injury occurred. [Frye v. Railroad, supra; Engleking v. Railroad, 187 Mo. 158.]

The mere fact that the petition charges that the injury was wilfully and wantonly caused by the agents and servants in charge of the train will not prevent a recovery, provided the evidence shows that the injury was the result of their negligence and carelessness.

The charge of wilfulness is sustained by proof of negligence. [Owens v. Railroad, 95 Mo. 169, l. c. 182; Brown v. Railroad, 66 Mo. 588; Neilon v. Railroad, 85 Mo. 605; Graham v. Railroad, 66 Mo. 538; Lange v. Railroad, 208 Mo. 458.]

*Third.* The third and last reason urged by appellant in support of its contention that the court erred in refusing its demurrer to the evidence is that the evidence shows that plaintiff's wife was guilty of such negligence that directly contributed to her injury as should prevent a recovery, even though it be conceded that its agents and servants in charge of the engine which struck and killed her were guilty of negligence in failing to ring the bell or sound the whistle, or to have the headlight of the engine burning, or in failing to properly look out for persons upon or near the track at the time and place where she was killed.

Now what are the acts of contributory negligence

of which counsel for appellant complain? Briefly stated they are as follows: Deceased, a lady in full possession of all her faculties, and on May 24th, about 8 p. m., was returning from a fishing and pleasure trip on the Meramec river, with her husband and her niece, and the Rev. Mr. Wright and his wife. She and the two ladies mentioned alighted from the boat and proceeded homeward, along the footpath before mentioned which led along and across the right of way and the track of appellant, while the two gentlemen who accompanied them on the trip tarried to tie up the boat. About the time the ladies reached the point where the path crossed the railroad track, they heard a train coming from the east and they stepped back to the south side of the track, and in a very short time a train passed them going west, presumably the first section of appellant's freight train, which was due at Pacific about 7:20 p. m. Immediately after this train passed all three of them lined up along the end of the ties in the edge of the gravel, on the south side of the track, facing north but looking east for another train which they heard approaching from that direction. Shortly after this alignment and while standing there a freight train with a bright headlight on the Missouri Pacific track hove around the bend in the track. That was an electric light and was very bright, which attracted their attention, but it did not, however, so absorb their minds as to prevent them from looking down the track of the appellant also to see if there was an approaching train. While they looked down appellant's track to see if there were any approaching trains, yet it was perfectly clear from all the evidence that none of the ladies saw or heard the approach of the train which struck and killed Mrs. Everett. The evidence shows that the accident occurred about 8 o'clock p. m., which was between twilight and dark, yet sufficiently light for persons and

objects to have been seen and distinguished from two hundred to four hundred feet. (By making an investigation I found that on May 24th the day on which the accident occurred the sun set at 7 o'clock and 13 minutes.) The reason why none of the ladies saw or heard the train is left somewhat to conjecture. The two survivors, however, testified that the bell was not rung nor the whistle sounded as it approached, which was so quick and so sudden that it passed them before they were able to realize what had occurred. We gather from the whole record that the brilliancy of the electric headlight on the Missouri Pacific engine largely engaged their attention while in the rather shadowy twilight the train of appellant suddenly and swiftly swung around the curve in the road, somewhat obscured by the smoke from the Missouri Pacific engine, unobserved, at a rate of speed of about fifty-two feet a second, and struck and killed Mrs. Everett before any of them were aware of its approach.

These are the facts which counsel for appellant say constituted contributory negligence on the part of Mrs. Everett. It must be conceded that it was negligence for the ladies to stand so close to the track when they were looking for approaching trains, and it must be also conceded that the deceased could have seen the approaching train had she used ordinary care in looking for it. The plaintiff's evidence shows that while it was somewhat dark at the time the injury occurred, yet it also shows that by looking, persons and objects could have been seen and recognized from two to four hundred feet. If the foregoing were all the facts in the case then there would be no question but what the plaintiff should not recover, but they are not all the facts of the case, as disclosed by the record.

Counsel for respondent in his petition and brief concedes the negligence of Mrs. Everett, yet they earn-

estly contend that notwithstanding her negligence the
appellant by the exercise of ordinary care could have
avoided the injury, and, having failed to do so, it is
liable to plaintiff notwithstanding the negligence of
his wife.  They point out the evidence which tends
strongly to prove that the train which struck and killed
Mrs. Everett was racing with a Missouri Pacific train
from Allenton to Pacific, and was running about thirty-
five miles an hour; that the bell was not rung nor the
whistle sounded; that there was no headlight upon
the engine; that by the exercise of ordinary care the
agents and servants of appellant could have seen the
dangerous position in which the ladies had placed
themselves in time to have warned them of the ap-
proach of the train, or to have stopped or slackened
the speed thereof in time to have prevented the in-
jury; and that the running the train at the rate of
speed along and across the footpath mentioned, where
they knew many persons were continuously passing,
without a headlight and without ringing the bell or
sounding the whistle, was negligence.

These facts according to the law as declared by
the repeated adjudications of this court make out a
prima-facie case for the jury.

In discussing this same question in the case of
Eppstein v. Railroad, 197 Mo. l. c. 734, 735 and 736,
in a well-considered case, LAMM, J., with remarkable
clearness stated the law as follows:

"In this case it is stoutly affirmed on one side and
as stoutly denied on the other that the latter principle
applies to the facts.  Does the principle apply?  We
think it does.  In a given case there might be such
scant or neutral evidence of public uses of a portion
of a track — mere sporadic instances thereof
— that a court, as a matter of law, would
determine that the servants of a railroad com-
pany charged with the running of a locomotive

engine, had no duty to look and see. In such case, unless they did see the dangerous exposure of a person on the track, and in time to avert injuring him by the use of ordinary care, the court would take the case from the jury. On the other hand, there might well be a case where the public user of a portion of the track by pedestrians was so constant, so pronounced, so manifest and uncontradicted that there could be no two opinions about it among reasonable men,. and the court, as a matter of law, might assume that locomotive operatives owed a duty to the public to be on the look-out there. Then, too, there might be a case lying between said extremes, and in our opinion this. is one, where the use by the public of the track was of such sort that it became a mixed question of law and fact whether those running a locomotive engine had reason to anticipate the presence of people, and in such case that issue should be submitted to the jury, as a fact to be determined by it. Liability in each instance is predicated of knowledge or notice of the user. Such notice may be proved by the existence of paths well worn by human feet, and by gaps, stiles and gates appurtenant to such path, by the long-continued going to and fro of people more or less constantly, and by the proved presence of schools, places of recreation, etc., and the use of the track by visiting pedestrians and habitues, all of which elements are presented in this case to an extent of such significance as made the issue, in our opinion, one for the triers of fact to decide. Confronted by the evidence indicating notice and knowledge, appellant remained silent, and in the practical administration of the law the every-day significance of that silence should not be ignored.

"Assuming, then, as found by the jury, that Mr. Eppstein was killed at a place where appellant's servants had reason to anticipate the presence of people

on its track, appellant is confronted with the duty of using ordinary care to see and ordinary care to prevent injuring him. How was that present and humane duty performed? It was not performed in this instance, because the ordinance requiring a bell to be rung was disobeyed. Because, moreover, appellant's servants, had they seen Mr. Eppstein, would have had no call to assume that he heard the notice of their train, or would step from the track to avoid danger. And this is so for the reason that the mere running noise of their train might well be submerged in the greater running noise of the heavy freight on the adjoining track. It is so for the further reason that his attitude, his arm, his hand, the direction of his vision, would demonstrate to any reasonable man that he was quite engrossed in the passage of the M., K. & T. train and oblivious of all else.

"Appellant's servants with plenty of space and plenty of time to see, with no obstruction in the way of seeing, warned by his preoccupied attitude and conduct of the fact that he was oblivious to their approach, owed him, we think, the simple and easy duty to tell him they at once purposed occupying the identical spot he was on with their ponderous engine. This is not requiring anything extraordinary at their hands —a twist of the wrist would have done it presumably. Indeed, the absence of all warning signals, by whistle or bell, would indicate to us, as a charitable view, that they did not see him, but were possibly doing precisely what he was doing, namely, watching the M., K. & T. train; and the silence of the appellant in this particular when confronted by the evidence in this case pertaining to the straight track, the peculiar attitude of this venerable man at the time he was struck and before, and the other facts in proof, must be held to indicate either an inability or an indisposition to controvert respondent's array of facts.

"That this case should have been allowed to go to the jury, we think is within the reasoning of many of our decisions, of which a sample must suffice, Morgan v. Railroad, 159 Mo. 262; Fearons v. Railroad, 180 Mo. 208—where the cases are reviewed, differentiated and applied. See, also, the remarks of GANTT, J., *arguendo,* in Scullin v. Railroad, 184 Mo. l. c. 705 and 707.''

In the case of Fearons v. Railroad, 180 Mo. l. c. 222 and 223, Fox, J., in discussing this question in his strong and able style, stated the rule in this language:

"The principle involved in the case at bar is by no means a new one in this State. This court, in a number of cases, has given expression in no doubtful terms to its views upon the subject. A careful examination of the Missouri cases, where similar questions have been involved, will demonstrate clearly a line of demarcation between the two contentions. The doctrines announced in the two lines of decisions are not in conflict; but the principles are correctly declared, as applicable to the facts in each case. These rules, as to the care and caution to be exercised by operatives of railways, spring from the dangerous character of the business. The law has a right to demand, in the operation of railways, whenever the person or life of an individual is in danger, the exercise of such reasonable care and caution as will avoid the infliction of injury.

"It is sought, in the announcement of legal principles, to make the application of the rules upon this subject reasonable, both as to the railways and the public.

"From the application of these reasonable rules, springs the distinction made manifest by the decisions, not only of this court, but, as well, in other jurisdictions.

"The distinction drawn by this court may be

briefly stated thus: that, whenever the motorman or engineer in the operation of its cars, before reaching a point along the line of its railway, has reasonable ground to expect or anticipate the presence of persons so near the railroad track as to endanger them, then the law, through its high regard for the preservation of human life, requires and demands such operatives to be on the alert, and to keep a lookout for the realization of the anticipation or expected presence of the person. Of course, this rule requires that the facts surrounding the given case shall be of such character as would warrant any reasonably prudent man to expect or anticipate the presence of the persons at the point on its road, and the burden of establishing these facts rests upon the party alleging them. On the other hand, the operatives of a railway are entitled to the presumption that there is a clear track and while care and caution should be exercised in the operation of their trains, they are not responsible to trespassers for failure to be on the alert to discover them, in the absence of any reasonable grounds for the expectation or anticipation of their presence on the track. In other words, they are not specially required to look out for persons who have no right to be there and whose presence was neither expected nor anticipated. Under those circumstances, the liability results from a wanton and reckless injury inflicted, after the discovery of their presence. But, again, if it is at a point where there is reasonable ground for expecting or anticipating the presence of persons, the presumption of a clear track is destroyed, and even though the persons be trespassers, it does not relieve those in charge of the moving cars from keeping a careful lookout for the person so expected to be present at that point.

"There was sufficient testimony in this cause, at least, tending to show a state of facts, in respect to the use of this tunnel as a foot passageway, from one

section of the city to the other, as would authorize the submission of the case to the jury."

And in the case of Reyburn v. Railroad, 187 Mo. l. c. 573 and 574, VALLIANT, J., states the rule with equal clearness in the following language:

"It has long been the doctrine of this court that though a man voluntarily adopts the dangerous track of a railroad for his footpath and walks in it apparently heedless of the danger entailed, yet if the servants in charge of the locomotive see him and realize his danger (or under some circumstances when they ought to see him if they do not) it then becomes their duty to exercise ordinary care to do what they can with the means then at hand to avoid injuring him, and if they fail in that duty the railroad company is liable notwithstanding the negligence of the injured man. Some of the cases in which this doctrine is declared are Kellny v. Railroad, 101 Mo. 67; Morgan v. Railroad, 159 Mo. 262; Klockenbrink v. Railroad, 172 Mo. 678; Hinzeman v. Railroad, 182 Mo. 611."

And the Kansas City Court of Appeals, through Judge JOHNSON, in the case of Cole v. Railroad, 121 Mo. App. l. c. 612, has well expressed the rule in the following language:

"The principles of right and justice do not tolerate the idea that the negligence of the person imperiled involved in his act of placing himself in position to be injured without giving proper heed to his own safety can co-operate with the negligence of one who comprehending his danger or being in a position to comprehend it by the use of ordinary care and having at hand the means and opportunity of avoiding it fails to reasonably employ them and by such failure inflicts an injury. Such negligence engrosses the entire field of culpability and eliminates contributory negligence as a factor in the production of the injury. It logically follows from the principles stated that the

issue of negligence in the performance of the humanitarian duty must be governed by the rules applicable to ordinary negligence. The determinative question in such cases is, did the operators of the car use ordinary care to ascertain the peril of the plaintiff and to avoid the injury after they discovered it or should have discovered it?

"In some of the decisions of the Supreme Court the idea appears to be expressed that in order to find a defendant guilty of a breach of the humanitarian rule the elements of wantonness and wilfullness must appear in its conduct, but, as we have attempted to show, the mere failure to observe ordinary care in situations of this character is of itself a wanton act, since it is abhorrent, not only to fundamental principles of law, but to the dictates of common humanity. The views expressed are supported by the weight of authority in this State, including the most recent decisions of the Supreme and appellate courts. [Moore v. Railroad, 194 Mo. l. c. 11, 12, 13; Rodgers v. Railroad, 117 Mo. App. 678; Eppstein v. Railroad, 197 Mo. 720; Ross v. Railroad, 113 Mo. App. 600.]"

These are but samples of the many cases that abound in our reports announcing the law as above stated; and there can be no question but what that rule is applicable to the facts of this case. Both the engineer and fireman who were in charge of the engine which struck and killed Mrs. Everett testified that they knew people were in the habit of using the track in passing to and from their work and to and from the boat landing. I copy the following from the evidence of Mr. Ramie, the engineer, as printed by counsel for appellant, on page 46 of their abstract of the record, viz.: "I have been acquainted with the defendant's railroad at Pacific for about 14 years; I know the surroundings there, the pump house, tie chutes and sand works. I know the people work there; have seen people

upon our track walking to Pacific and to the sand works and tie chutes and the Meramec river. I cannot say I know where they were going, but I have seen people on the track there. I know that on May 24, 1904, I looked out along there everywhere on the railroad; that is my rule. There was no difference in this particular instance.'' And the evidence of Mr. Ryan, the fireman, was substantially the same as that of Mr. Ramie.

It is made perfectly clear from their evidence that they not only had reason to apprehend the presence of persons upon their track at the point where Mrs. Everett was killed, but that both the engineer and fireman who were in charge of the engine which struck her had actual knowledge that the people of Pacific had for years been in the habit of using the track at that place in going to and from their places of work and also to and from the river; and not only that, both of them testified that on that account they were upon this occasion looking to see if anyone was upon or near their track, and that they saw no one, and actually had no knowledge of the fact that they had killed Mrs. Everett until they reached St. Clair, the next station west of Pacific, where they were informed of the unfortunate incident by telegram.

If the facts were as the evidence of respondent tended to show they were, namely, that the trains were racing, that appellant's engineer and fireman knew of the constant use of their track by the people of Pacific at the place where Mrs. Everett was killed, that the engine had no headlight burning, that the bell was not rung nor the whistle sounded, and that persons could have been seen and distinguished from two hundred to four hundred feet at the time of the injury; then the conduct of appellant's employees amounted to gross negligence; and were we called upon to weigh

the evidence, we would have no hesitancy in saying that it preponderates in favor of the respondent.

In the case of Becke v. Railroad, 102 Mo. 544, where the facts of the case were strikingly similar to those of this case, this court, in speaking through BRACE, J., on pages 551 and 552, used the following language:

"But it is not possible that reasonable minds could come to any other conclusion than that the failure of those having in charge a passenger train, running through a populous country, at the rate of twenty-five miles an hour, approaching a crossing near the suburbs of a city, in the night, on a dark night, to have the headlight of the engine lighted and burning was an act of negligence. This is a common and necessary means adopted by all railroad companies for the protection alike of those rightfully on the train, and on the track, or approaching it in the night time. No engine is constructed without such a light, and no train is run in the night time by any railroad company under any ordinary circumstances without having it lighted. This is a fact known to all reasonable minds by common experience, and the court committed no error in declaring that it was negligence if the defendant's servants failed to have such light lighted and burning at the time of the collision. It is the duty of those approaching a railroad track at a public crossing in the night time to look that they may see an approaching train, and the corresponding duty is imposed upon the employees of the railroad company to have the light burning by means of which the approach of the train may be seen by those whose duty it is to look."

We are, therefore, of the opinion that not only the negligence of the deceased should not have prevented a recovery in this case, and that the action of the court in refusing appellant's demurrer to the evidence upon that ground was proper; but also that the

jury was amply justified in finding that issue for the respondent; and, also, that notwithstanding her negligence, the injury would not have happened if the agents and servants of appellant in charge of said engine after they discovered or by the exercise of ordinary care could have discovered the perilous position in which she had placed herself had used reasonable diligence to have warned her of the approaching train, or to have stopped or slackened the speed thereof in time to have averted the injury.

II.   Counsel for appellant have presented many objections to the instructions given by the court on behalf of the respondent.  We have set out the instructions in full, and have carefully considered each and all of the objections thereto, which we think are more technical than substantial.  By reading the instructions in the light of the cases cited under the third subdivision of paragraph one of this opinion, and the quotations made from some of them, it will be seen that they declare the law to the jury in the spirit in which it is there expressed by this court.

III.   It is finally insisted by counsel for appellant that the court erred in refusing to permit it to show that plaintiff had the Rev. Mr. Wright subpoenaed as a witness in the case in his behalf; that he was in the court room in response thereto during the progress of the trial and that he was not called as a witness. Counsel for appellant have not pointed out to us in what way that evidence was material, nor are we able to see its materiality.  It tends neither to prove nor disprove any issue in the case.  Besides, all the evidence regarding Mr. Wright shows he was at the boat landing with respondent at the time the accident occurred and he saw nothing whatever of the occurrence. We are, therefore, of the opinion that the action of the court in that regard was not error.

214 Sup.—7

For the reasons before stated, we are of the opinion that there was no error committed during the progress of the trial, and that the judgment is for the right party, and should be affirmed. It is so ordered.

All concur except *Valliant, P. J.,* absent; *Lamm, J.,* in result.